Okay, the first case for argument this morning is Rasmussen Instruments v. DePuy Synthes Products, No. 23-1855. Mr. Kastanis, when you're ready. Thank you, Your Honor, and may it please the Court. This case presents several important issues, and unfortunately there are only a very limited number of reasoned rulings for this Court to review, but I intend to focus on these three in the interest of our limited time. First, Rasmussen Instruments is not a patentee because it does not own the certain patents. Dr. Rasmussen assigned his then-instrument patents to Wright Medical in 2006, and Wright Medical never assigned them back to him. Ruling in our favor on this issue disposes of the entire case. The appeal would cross-appeal both. Second, the District Court's claim constructions were erroneous. Tibial component, femoral component, and tensioning apparatus are all means plus function limitations, but the District Court thought otherwise. We filed a Rule 28J letter on this issue involving this Court's recent optus decision that addresses these issues. Reversal on this ground will require remand for a new trial, but likely dispositive motions before that. And third, even without regard to these erroneous claim constructions, there is no substantial evidence of direct or indirect infringement. Plaintiff's direct infringement evidence was a facially unreliable survey from Dr. Isaacson that should have been excluded at the threshold. And as to the various indirect infringement claims, plaintiff failed to make the required showing that DePue subjectively knew that the acts it was allegedly inducing constituted infringement. I'd like you to focus on the indirect infringement, and tell me why that's a compelling argument in your favor. Well, very simply, because in Global Tech in Common, the Supreme Court said that the knowledge requirement of induced infringement, and this extends to contributory as well, requires not just knowledge of a patent, but knowledge, and I quote here from Global Tech, knowledge that the induced acts constitute patent infringement. There is absolutely no evidence from which a jury could have made this conclusion in this record. I suppose your adversary will argue that, well, there were instruction manuals distributed that would encourage surgeons to do what is recited in the claims. Right, but that's not enough. That only gets them past the first prong of Global Tech. It just doesn't show knowledge of infringement. It doesn't show knowledge of infringement. It only shows knowledge that they knew that surgeons might use the instruments in the way instructed by the manual. And that's the pre-Global Tech way that these cases were tried. But after Global Tech and after Common, as indicated, I think HZNP is one of this Court's more recent post-Global Tech, post-Common decisions. It makes absolutely clear that this is also a requirement of induced infringement, and there's just no evidence of that. And Judge Lynn, I'd even point you to the closing argument in this case, which you can find at pages 14, 873 and 74. That's my friend over here arguing to the jury, and he walks right up to the showing that he needed to make and then realizes that he can't make the argument of knowledge of infringement because there wasn't any evidence to argue from. Could you take a step back and talk about the ownership issue? Yes. I want to talk about kind of the interplay between the 2006 agreement and the 2013 settlement agreement. Sure. So our case is actually very simple on this. In the 2006 agreement, Dr. Rasmussen, because remember the plaintiff here is Rasmussen Instruments. They didn't exist at that time. He assigned his patents to Wright Medical. That's in Section 3.2. It's a hereby assigned provision, so it's immediate, self-executing, doesn't require anything further. That should be, I think, undisputed. Wright Medical never assigned those patents back to him. That's the way title moves. The amendment in the 2013 agreements were only looking forward, not backward. They didn't restore any ownership rights. And to the extent that that 2013 agreement contained any assignments, look at the new Section 3.2. It did contain some assignments. The assignments were all from Dr. Rasmussen to Wright. So they knew how to make an assignment. They just didn't do it. And this happens all the time in these patentee cases. The parties may have thought or a party may have thought subjectively that they did enough, but it's pretty clear that they didn't do it here. In fact, it's crystal clear. Hypothetically, because I agree, there's no language in the latter agreement that says we assign these rights back, which is what we usually see when we see these assignments. But if they do it a different way, so they have the agreement, and let's just assume I agree with you that the original agreement signs these. It's a pretty broad assignment, so I think it probably does. And instead of doing that we assign back, they say this agreement is, this previous agreement is replaced both prospectively and retroactively with this new agreement, which deletes that assignment. Why isn't that enough to get rid of the assignment? Well, I think that might be enough if I understand your hypothetical correctly. The problem is, of course, that's not this case. The 2013 agreements had an effective date of 2013. Not surprisingly. It didn't say we're going back. It didn't say, to use the word that my friend liked to use in the district court and again in his briefs here, nunk protunk. It didn't say this is going back and it's novating or something like that with the contract. It just said we're changing our arrangement a little bit going forward. But we're not eliminating our arrangement. They're continuing that arrangement. They're continuing the business arrangement. So, go ahead. Okay, I understand that. What if they said instead of what I said, the 2013 agreement is canceled? The 2013 agreement is canceled. The 2013 is the original one, right? No, 2006. I'm sorry, 2013 is the later one. Sorry, I should just talk about them in the first and second. So what if they just come up and say this 2006 agreement is canceled? Well, here's the problem that I see at least potentially with that. And that is that conveyance of property means that the property is in the hands of the devisee, right? So once the property is in the hands of the devisee, maybe they don't even own it anymore. Maybe they have alienated it in some way that doesn't make it easily returnable. That's why this court requires assignments to be in writing. Or I shouldn't say just this court. That's why Congress requires assignments to be in writing. And that's why state law requires assignments to be in writing like this. There just isn't an assignment back. I think if there were enough terms in your second hypothetical, Judge Hughes, that suggested that yes, we have the title to the patent. Yes, we are intending on giving it back to Dr. Rasmussen. Then maybe. But I think on your bare hypothetical, we just don't know the answer to this. We need something to suggest that the licensee intended to give back the patent rights that the licensor had given. Exactly. And that's absent. And to the extent that my friend calls this a factual issue, there were no facts adduced at trial. You can't find an assignment. Well, is there such an ambiguity, though, that requires us to potentially look at extrinsic evidence with respect to whether or not there would have been assignment back? Judge Cunningham, the answer to your question is no. The reason the answer to your question is no is that whatever ambiguity there is, even if it were resolved in their favor, doesn't lead to the conclusion that there was an assignment back. It just doesn't. What is the effect, though, of the deletions relating to the term licensed product? It means that on a going forward basis, the licensed product, which was the Zen instrument, is no longer going to be the licensed product. That's what it means. When was this issue first raised at the district court? It was raised during the trial, actually before the trial, because it was in the pretrial order. They said that they had the burden and they were going to prove that they owned the patents at trial, and we raised it in Rule 50A since it was a legal issue. In the pretrial order, did you dispute ownership? I understand that you said the pretrial order explained that they had the burden. Did you basically indicate that there was going to be a dispute on ownership? I don't remember if we had any specific language on that issue. Is the pretrial order in the appendices? It is. What's the page? Let me see if I can find it quickly. If one of your colleagues who's here needs to find the page and needs to give it to you, you can do that and keep going in the meantime. Let me make the further point. We'll find the pretrial order for you and we'll talk about that. I'll be willing to say that if we didn't say anything at all about the pretrial order, it's still their burden to establish ownership. Once the evidence started coming in at trial that they weren't going to be able to prove ownership, we moved, for Rule 50, a judgment as a matter of law. That seems to be exactly the place where you test a legal theory. The judge was very interested in it. He said that he and his clerk were looking at it, but ultimately they did not. Ultimately, we didn't get a reason ruling on either 50A or 50B. At 9377, the jurisdictional question, so I think this is actually the joint part of the order, it says it is Rasmussen's burden to prove that it is properly the sole owner of the assertive patents. Dupuy does not believe that Rasmussen has met that burden. Rasmussen notes that although its ownership is not disputed, of course that's their position, it will meet its burden to prove it. So I hope that's helpful. If I could move on from the ownership issue to the claim construction issue, I think we have outlined... I actually have a different question. Oh, please. If we agree that the district court needs to take another look under Dahlberg at that survey testimony, or even go further and just say it's just facially unreliable and throw it out, what's the effect of that on this case? Well, there's a conundrum with your question, and it's not clear from the briefs why it's a conundrum. The judge in this case has retired. Well, I understand that. We looked that up. The case is now in front of a new judge, but I think our answer, Judge Hughes, would be that this survey, actually the Isakson survey and then the Putnam evidence to the extent you'd even have to reach that, is so facially unreliable, 60% false responses, that this court can, as a matter of law, just rule that that was an abuse of discretion and could not have been admitted. And what does that do to the direct and indirect infringement? Well, on indirect, I've already addressed that issue. I think indirect, by the way, wins the case for us almost entirely. It may be entirely, because their case for direct infringement by DePue itself is pretty thin, and I don't plan to get into all of that, especially now that I'm already into my rebuttal time. But with regard to direct infringement, their case was pitched on the Isakson survey. The Isakson survey, I can go through what's wrong with the Isakson survey, but the principle one is 60% of its respondents weren't paying enough attention, and they picked at least one or both of the false instruments that were in there. And how Dr. Isakson was able to say, well, this gives me great comfort in my results, is beyond me. This court encountered him before in the Parallel Networks case. I know, Judge Hughes, you wrote the opinion for the court in that case, where Judge Jordan excluded him for a very similar sin, if you will, of expert testimony. And one of the other problems with his survey here also is that the balancizer, it turns out there were two balancizers, only one of which infringes. And he didn't take account of that, and he admitted that if the non-infringing balancizer had been used by a responding doctor, they would have had to check that they used it. So he admitted his numbers were no good even on that ground. But I think this is a case where, I think, in Ecofactor, for example, Judge Stark, in his separate opinion, talked about the Smith v. Jenkins case from the First Circuit, which is a case we rely on in this case. In Smith v. Jenkins, Judge Stark said, well, the court there remanded for the district court to reconsider the issue of admissibility. Well, actually, the court in the First Circuit ruled as a matter of law that there was an abuse of discretion, and the testimony should be excluded on two of the three points that the expert had put forward. That's the path you should take here. This is so unreliable. There is no set of reasoning that, in my mind, could plausibly be offered to justify this. And I'm well into my rebuttal time. Yeah, that's fine. We'll restore your full rebuttal time. We had a lot of questions, but let's hear from Mr. Blitzenstein. Thank you. Good morning, Your Honors, and may it please the Court. If I may, I'd like to start with the ownership issue. And in particular, I'd like to frame the issue by addressing four points that were presented in Appellant's yellow brief. And starting with the 2006 agreement. The 2006 agreement just applying classic principles of contract construction in no way was an assignment of the patent rights at issue here. The patent rights at issue here were filed before the date of the 2006 agreement. The 2006 agreement is by its terms forward-looking with regard to the assignment of patents. So where it says, I hereby assign, I'm paraphrasing here, but I hereby assign know-how in inventions. When you look at the actual definition of inventions, which of course is critical in 1.3, it expressly uses language that is forward- What page are you on? It would be Appendix 19136. Are you referring to Paragraph 3.2? I will, but for the moment on 19136, I'm referring to the definition of inventions. Okay. And inventions is defined as, amongst other things, improvements, modifications, enhancements, and later variations. All words that are prospective and forward-looking. By contrast, the next definition, know-how 1.4, talks more generally about data and information, know-how type things, like materials, ways of using devices, things like that. What is notable and what is critical from a contract interpretation perspective is that 1.4 says that the know-how that's conveyed by the 2006 agreement is the know-how, and I'm looking at the second-to-last line of 1.4, know-how developed, quote, prior to or during the term of this agreement. Close quote. So we have expressed language in 1.4 that shows that the parties knew very clearly how to delineate past from future. That language is notably absent from the inventions definition in 1.3, and it's the inventions definition on which the appellant rests its argument that this was a conveyance of the patents in this case. Again, those patents were filed before this agreement. In this Court's decision in Euclid, in that decision, the Court held that where there was, in that instance, patents that had issued prior to the execution of the agreement and one of the patents in the family was not listed in the assignment, that that was probative evidence that that assignment did not cover that patent, even though the assignment covered continuations. So Euclid is highly probative of the fact that the absence here of any reference in the 2006 agreement to the already filed patent applications of Dr. Rasmussen were intended to be included. Now, is your argument dependent on whether or not we're focused on know-how or inventions, or does it not matter? It does matter, Judge Cunningham, yes. So know-how, so under Utah state law, the Jones case that we cited, as with many states, the agreement must be interpreted to give a fact and not render superfluous various provisions of the agreement. And since the parties to the agreement took pains to differentiate inventions, being forward-looking, and that covering patents, and know-how not covering patents but being more general to things like, again, what materials to use in constructing a device, how to use a device in a clinical setting. On this issue, it didn't seem like there was any disagreement, at least with regard to Appellant's blue brief, where they say at 35, quote, Rasmussen also assigned any after-acquired patents on this technology, close quote. Fast forward to their yellow brief, and they take a different position, and they say that our position, that only forward-looking patents, only patents after the date of the 2006 agreement were assigned, cannot be squared with the language of the 2006 agreement. What about the language in 3.2? 3.2 talks about an assignment of all consultants, with right title and interest in the know-how and the inventions, but in the know-how and other intellectual property rights, and all documentation and all patent, trademark, trade secret, copyright, and other intellectual property rights relating thereto. So if the know-how is not limited to forward-looking and this language refers to an assignment of know-how and all of the property and patent rights relating thereto, isn't that enough? The know-how, we would submit as a matter of contract interpretation, the know-how does not encompass patent rights, and you can see that as you have to go back. Maybe not, but paragraph 3.2 assigns the patent rights relating to that know-how. And that would be forward-looking patent rights. Not the know-how. The know-how is not limited to forward-looking. The know-how, though, is not the inventions that are developed. I understand that, but there's a distinction. You just pointed it out between inventions and know-how. Inventions forward-looking, know-how not forward-looking. And here's an assignment of all patent rights relating to that know-how. And the know-how, there's been no evidence in this case that the patents in this case are somehow related to the know-how, plus they are arresting their assignment argument. To follow up on Judge Lynn's question, even if you look at the next section, 3.3, where it talks about patent filings, it does group, again, inventions and or know-how together. And so I really do feel like there's a lot of merit to the argument that I believe Judge Lynn was presenting to you. So under Utah state law, giving the different provisions of the agreement different effect, we submit, would say that the inventions cover the patents, which should be understood to cover the patents, but the know-how should not be intended to cover future patents. I mean, I would note, just by way of example, even in 3.1, with regard to the disclosure obligations, the disclosure obligations only extend to future inventions that are developed by Rasmussen. All right. Can you turn to the indirect infringement? I can, Your Honor, yes. With regard to indirect infringement... I mean, there's lots of evidence about instruction manuals and knowledge of the patent. Where is the evidence of DePuy's knowledge of infringement? So we address the... There's a substantial body of evidence, which we address in our red brief at pages 83 and 84, from which a jury, on the basis of circumstantial evidence, could easily have concluded that DePuy knew that his acts constituted patent infringement. By way of one example, one of their engineers, after the 180 patent issued, recognized the patent, recognized its significance enough to circulate it to several of his colleagues, and then also recognized its significance enough to ask his patent attorney, or DePuy's patent attorney, to put a watch on further patent activity by Rasmussen. But how does that show knowledge of acts of infringement by doctors using these devices? Well, it shows knowledge by DePuy, because DePuy's engineers... There's a question that they knew about the patent. It shows that they knew that they had an infringement problem with the patent because they went out, they took special panes, they identified it, they singled it out, and they said, we need to put a watch on Dr. Rasmussen's patents to keep an eye on what else he's doing. Mr. Rock testified that he hadn't done this in 20 years. This was not a routine practice of his. He knew that there was a problem because he had been involved previously with extensive studies of Dr. Rasmussen's work, his inventions, his products, and when he saw the 180 patent, he took great panes and took unique steps to inform his colleagues about it and to make sure that they knew about other things coming down the line. That shows a level of awareness and concern that is clear circumstantial evidence on which a jury could and should, frankly, find indirect infringement. If I could, I'd like to return to the assignment issue and, in particular, now the 2013 agreements. And there are two. Now, in between the 2006 agreement and the 2013 agreements, the evidence shows that the counterparty to the 2006 agreement, Wright Medical, took no steps at all to demand from Dr. Rasmussen that he formally assign any patents over to them. They didn't take any effort to record their interest in the patent office. Their activity is further evidence, their course of dealings or their inactivity is further evidence that none of the parties intended for the 2006 agreement to convey the asserted patents in this case. But now we go to 2013, and now we have two very interesting agreements that bear directly on this issue. The first is the 2013 settlement agreement, and that agreement contains a very specially and deliberately crafted provision, which is at, this is A19160. And Judge Hughes, this may address, at least in part, your question to my brother, which is in paragraph 5A, the parties said, quote, this amendment shall be deemed incorporated into and a part of the agreement. That is language with the parties deliberately intending to give retroactive effect, what you call it, non-protonical retroactive effect, but to substitute the provisions of this settlement agreement back in time to 2006. And it makes sense that they would do that because the parties were going their separate ways. The suggestion that they were trying to define their relationship going forward just makes no sense. So what they were deliberately trying to do here was to revise retroactively the provisions of the agreement, including by taking out the very language that appellant relies on to support its assignment argument. What is the import of the effective date in this agreement? Well, the effective date is when that retroactivity is triggered. So until the effective date, the 2006 agreement, prior to its revision, remains as stated. So whatever provisions and obligations were in there, those remained. But once they hit that effective date, then it had retroactive effect. And to the sort of the hypothetical concern raised by my brother about third parties, there were no third parties. We're talking about two parties to the agreement. No one's else's interests are possibly affected by this saying we choose, as a matter of contract, to change how we did things. I understand the concept of an effective date. I guess I should have asked you what is the effective date. Maybe I should have asked you that. It's upon execution of the agreement. It's in the previous. It would be November 1, 2013. But now let me go to the other agreement in 2013. And this is the settlement agreement. I'm sorry, the license agreement. This can be found at Appendix 19165. This agreement repeatedly recognizes that Wright did not own the patents in the suit. We know that from almost every provision in this patent, in this license agreement. First off, if we go to Appendix A, which is at 19168, those are the patents in the family of this case. So there's no question that the asserted patents in this case are the subject of this license agreement. So first off, in the third whereas clause, back on 19165, it states, Licensor, that's Dr. Rasmussen, is the record owner of the patents. So that is an express acknowledgment by Wright that Dr. Rasmussen is the owner of the patents, the record owner. Now they say in their yellow brief, they say, well, that just means he's recorded at the patent office. Well, not so. This license goes on, and in paragraph 1, well, it grants a license from Rasmussen to Wright. And Wright pays $250,000 for that privilege. You don't pay $250,000 to license a patent you already own. Their whole thesis is Wright already owned it from 2006 on. They wouldn't pay for something they already own. But it says more than that, and I'd like to direct the Court to the fifth to last line in the license grant. It says, quote, Licensor retains all rights to grant non-exclusive licenses to the inventions described in the patents to third parties in licensor's sole discretion, close quote. The word retains there is critical. Retains means it had, that Rasmussen had the right to license before this agreement and kept the right to license after this agreement. And it goes on in 2.1. It says, Licensee shall have the right to bring a suit in its own name. Well, that's one of the critical hallmarks of ownership. And it goes on to say in 2.2, Monetary recovery shall be to Dr. Rasmussen. 2.3 on the next page, Rasmussen shall have the right to compromise and settle any claims arising from it. So in sum, this license agreement in 2013 expressly acknowledges that Rasmussen retains the rights to license, sue, and settle. Those are all, every single one of the fundamental rights of ownership. And Wright and Rasmussen, Wright acknowledges it in this agreement. And this is not parole evidence, of course. This is the same parties to the 2006 agreement in a- So are you using this to suggest that any ambiguity in the 2006 agreement should be resolved in your favor or that it makes plain the 2006 agreement? The latter, Your Honor. This is clear evidence of the intent of the parties. Okay, so let me ask you this. If I disagree with you and I find the 2006 amendment is plain and assigns the patents to Wright, is this sufficient to be a reassignment back? Yes, Your Honor, it would be. This is not- So what's the language that says we reassign the patents? It's- those words, if this is verbose, those words are not there. But this court has repeatedly held in ownership cases that substance matters, not labels. And as I read this court's decisions on ownership issues, the substance that always comes up, that's always examined and given closest scrutiny, are the rights to license, sue, collect money, and settle. But are you relying just on this license agreement to say there would have been an assignment back? Or are you also relying on the settlement agreement? And if so, which aspects? So both. And so the settlement agreement, as a result of that clear retroactive language that I mentioned earlier, selectively goes through and deletes provisions from the 2006 agreement, thereby defeating their theory for why the 2006 agreement- You're into your rebuttal time, but I have a question about that expert report. Yes, Your Honor. First, you can address the merits of the Daubert. It looks like the district court didn't actually do a fulsome analysis or any analysis at all under Daubert, and I think that's problematic. But you can explain why that report's sufficient. But if we disagree and find that either the district court needs to readdress Daubert or we just find that as a matter of law that that report is insufficient, then what do we do with this case? Thank you, Your Honor. And before I, as sort of a component of answering that, to answer sort of an implicit question in the last set of questions about ownership, we would submit that if the court were to disagree with us and conclude that the 2006 agreement did assign the rights, that a remand would be proper. Same answer for Daubert. We would submit that a remand would be proper. With regard to the standard of review here, I think there's been some confusion here, but under First Circuit law, the standard is quite high. I don't want you to talk about the standard. I want you to start with the premise that that expert report needs to be reexamined either by the district court or that we may throw it out ourselves. What happens to the case then? I mean, I understand in the first instance a remand. I guess I'm asking, if we find that expert report so insufficient as a matter of law, is there still evidence in this case for a new trial on direct infringement, or is that your main evidence? So there is. Would you like me to address the survey issues, the merits of it first? You can talk about it. Yeah, okay. So there are two principles, three if you count hearsay, but this was clearly under the permissible hearsay rules of 807. But the arguments that I heard today concern these controls versus distractors. Controls versus distractors are a fundamentally different thing. A control is the objective of a control is to identify false positives, somebody who is not paying attention. The objective of a distractor is the opposite. It's to identify somebody who's paying really, really close attention to the questions and is trying to guess what the objective is. Are you asking about sizers or are you asking about jigs? So good survey methodology, as Dr. Isaacson testified to, without any disagreement from any expert from DePue, good practice says you want to make sure that you hide the objective from your respondents. Do you admit that Isaacson failed to weed out the false positives in the survey? They're not false positives in the... No. So yes, I do disagree that Isaacson did not... He correctly removed the false positives and he correctly did not remove any of the answers for the distractors because they served fundamentally different survey methodology purposes. So they were there for different purposes, so the fact that people selected whatever they selected from the distractors, which were the three jigs that were tested, the fact that somebody said yes to any one of those things, it just doesn't bear on the fundamental question of usage of the balance sizer, which was what he was trying to answer. As far as this issue of this made-to-order balance sizer, they elected to treat this issue as one of cross-examination. They treated it as an issue of weight. They cross-examined... Assuming the survey evidence could turn out, what other evidence of direct infringement do you have? Can you just kind of categorically sum that up for us? So there are two points to that. The first is DePue conducted its own surveys where their percentage of usage actually lined up pretty well with what Dr. Isaacson's survey concluded. So their numbers were 24% in approximately the same time frame. Now their response to this... I'll just sort of get ahead of that. Their response to that is, well, those are for all gap-balancing instruments, and this case is about the balance sizer. Well, our response is, as we stated in the brief, that's because of their incomplete record-keeping. So you've identified the DePue surveys. Is there anything else in terms of direct infringement besides DePue surveys and the survey evidence? The surveys that were discussed by our other doctor expert, surgeon expert, Dr. Kamara, were also in there. Same type of survey. And then as to this issue of other direct evidence of infringement, there's an issue here that has come up in DePue's yellow brief for the first time with regard to this other... I mean, we argued to the jury that the other act of direct infringement is that DePue provides... DePue itself provides the parts that make up the accused products, the infringing products now, as an unassembled kit in trays so the surgeons can put them together. But the jury was instructed that our contentions on direct infringement were both the unassembled kits and the assembled balancizer. That's A125. And DePue did not object to that. And then DePue only raised this issue of the unassembled kits because this is an act of direct infringement by DePue itself. DePue only raised this in a conclusory one-sentence issue... But since you're way over time...  We would submit they forfeited this argument that they're making in their yellow brief, Your Honor. Okay. Let's hear from Mr. Casanas. Thank you, Your Honor. Thank you, Your Honor. Can you go back to the ownership issue? Yes. It's right where I was going to start. Address that second license agreement. Yes. And so the second license agreement, as we've pointed out in our briefs, is a recognition that Dr. Rasmussen was the record owner. And that's something very different than actual ownership. We've cited cases in our brief that suggest that. And I think this Court's decision in certain technology also makes that clear. But here's the point that I really want to leave the Court with, because my friend told you that this recognized that Dr. Rasmussen had all the bundle of rights that are attendant to ownership, but he misread Section 2.1. Look at Section 2.1 with me, Appendix 19165. It says, Licensee shall have the right to bring a suit. Who's the licensee in this agreement? That's right. Monetary recovery goes to the licensee. Who's the licensee? That's right. It's not Dr. Rasmussen. The licensor agrees to be named as co-plaintiff with licensee. Yes, and that's an absolute belt and suspenders provision. It certainly makes sense that if the parties were unclear or maybe Dr. Rasmussen said, we don't know much about what went into this agreement, but what we do have are the words of the agreement. As Judge Hughes pointed out in questioning my friend, there's no assignment language. As you pointed out in questioning my friend, it's a going forward document, not a going backward document. And at most, this document is consistent with perhaps a disagreement between Wright and Dr. Rasmussen over who the owners of the patent were. So they agreed on language that said, licensor is the record owner. That's fine. That's a true statement. There had never actually been a registration of the assignment in the patent office, so that's a true statement. The non-exclusive license is, OK, here's some money to allow you to resolve this and go forward, and I'm going to grant you a license to anything that I have. But it's not an assignment. A license to be an assignment under this court's case law has to be a license of all the rights. And I just pointed out- Are you contending then, though, in terms of this license agreement, that licensor wasn't able to make or actually give the license? I just want to make sure I understand what you're contending this license agreement actually did as a practical matter. Make sure, because we've already seen some confusion about who the licensor and licensee is here, so I'm sorry. So who are we speaking up with regard to who can give the license? So at least what's stated on appendix page 19165 is the licensor is Dr. Rasmussen as opposed to Rasmussen Instruments, right? Right, right. And then it lists the licensee as Wright. What I was trying to get at, and I'm not sure if this is argument you're making, but I want a clarity on this from you, is whether or not you're suggesting that licensor, Dr. Rasmussen, was he even- were there even rights that could be licensed? Because one of the things you've also talked about previously when you were up here was about the plaintiff actually being Rasmussen Instruments. Well, that's a company that was created right before the suit was filed and then the later assignment purported to be from Dr. Rasmussen. So I'll put that aside because at this point in time, the only parties we care about now are Wright and Dr. Rasmussen. What you're seeing here is a grant of a non-exclusive license. That's sort of, I'll give you permission to do whatever it is that I might have to give you permission to do. It certainly looks like they did not have a clear understanding that Dr. Rasmussen was going to be or was the actual owner. Because again, look at those rights in section 2.1 and 2.2. Those are rights that belong to Wright. With regard to- I'm sorry, you're out of time too. I know there are a lot of issues, but we have three more cases this morning. We appreciate the time. I didn't hear any discussion of cross-appeals, so there's nothing for you to rebut. Thank you for your time. Thank you. Case is submitted.